first case on this afternoon's docket. It is Wilson against Wilson, counsel for the appellant. Please proceed. Please state your name for the record. Thank you, Your Honor. My name is Jay Zanton. I represent the appellant, Andy Wilson, now Andy White. This case comes in front of Your Honors today from the order that modifies the prior order of child custody that was entered in Clinton County, Illinois. Back in January 2005, there was a divorce decree entered involving the parties. The parties were awarded joint custody of their two children, primary to mom and dissipation to dad. In June of 2016, the modification of that custody order, a trial took place and an order was entered by the court modifying custody. What I think is important to understand at the onset today is that at the time of the trial, the burden of proof that the appellee had in order to prevail on a custody modification, even with the new standard that was introduced over a year ago, although they changed the ultimate burden of proof from a clear convincing evidence to a preponderant standard, it did not change the requirement that the movement prove a substantial change of circumstances in either the parents or the child, and they needed to prove or that movement had to prove that the modification would serve the best I think at the onset is that the term substantial, the case law in the state of Illinois has been quite consistent over the years when it talks about change conditions in and of themselves are insufficient to meet this first criteria. The statute requires substantial, and that's been interpreted by many districts, including this district, especially in the Houston case that I cited, that the term substantial means that there has to be some sort of adverse effect that is occurring on the child. The child has to be experiencing an adverse effect. Now, wasn't there a divorce in this case, a second, didn't she get a second dissolution of marriage from the person she moved, did she go in another state or something? She did. And I thought that she, when was the dissolution of that marriage? Well, the dissolution of that marriage occurred probably five or six years after the movement. Okay. After the movement. And how old are the children at the time of this dissolution, or this judgment change? At this point, at the time that this order was entered here recently, the oldest child, Austin, was 17. He was about to start his freshman year in high school. And the younger child, Lucas, who was the only child subject to this modification, was 14. He was about to start his freshman year, or actually had started by the time the order was entered. In what state? Tennessee. And the 17-year-old is in Tennessee? Still in Tennessee. Okay. The important thing to understand is that you have to have some sort of adverse effect on the child. And the allegations that were sent out in the petition to modify, there were five different allegations. And I'm going to go through those very quickly this morning. But the first one basically said that the child, Lucas, who was the 14-year-old, was older. Well, in all honesty, in every custody modification proceeding, children are older. That occurs. That's a fact. But that's not a substantial change in circumstance. It's no different than a move, somebody's moving, or there's a change of jobs. Unless there's some sort of adverse effect on the child, that's just a simple fact. So the first allegation of just getting older, to me, and I will submit to this Court, does not raise to the level of any type of substantial change in circumstance. How much older was he from the time of the initial? How much older was he? Eleven years. Eleven years, so eleven years older? Yes. The second allegation that was sent out in the petition to modify basically said that the Adelaide's work schedule may have been generally available to care for the child. The problem is that there was no evidence presented at the time of the trial that, again, raised to some substantial change in circumstance. In other words, that this child wasn't being taken care of by his mother. In fact, when the child was interviewed by the Court, the child told the Court, my mother treats me well. He had no problem with how his mother treated him. The interesting thing, there was no evidence presented that the father's circumstances before were such that he couldn't take care of the child, and now he could. There was no evidence that the mother wasn't able to take care of the child. In fact, the evidence was actually the contrary. In addition to the child saying he was being treated well, the evidence also showed that the significant issue involving this child dealt with his academics. And the mother, in this case, went to extraordinary levels to deal with the child's academics. And this was very important because the child had a learning disability. And this mother went through IEPs. This mother had constant contact with the school, daily contact with homework. It was a daily situation that the mother had to address concerning this child. What was so, I will say, bizarre about the father's take on all this was I specifically asked him, what is an IEP? He had no idea. I asked him about what were the child's academic issues. He had no idea. In fact, what he said to the Court was the academics were, as far as he was concerned, was left, quote, up to the mother. The mother would deal with the child's academics. Was there any testimony with regard to the mother sharing that academic issue, those problems with the father? There was no testimony to that. In fact, I'm sure it was even addressed one way or another in the State Department. So nobody alleged that she had concealed those issues from the father and the information, but wasn't given it? No. To be blunt with the Court, I believe the father was, quite frankly, indifferent when it came to this child's academics and the needs of this child concerning his academics. The other thing was, Counsel, didn't Judge Brandmeier find it significant that the Illinois? I think the Court mentioned that. We had also filed pleadings concerning that particular issue that the Court, I guess, figured were moot in light of the Court's rulings to address that particular issue. The problem was this. The order got entered, said if they divorced, they would return to the State of Illinois, or after the mother divorced. The mother stayed down there. She had a job. The kids were well integrated into the school system. They were well integrated into the community. They continued to reside there. The father didn't object. The father continued to exercise visitation. They continued to live there. There was no reason, and I could say, I guess, other than the order, but there was no reason to uproot these kids at that point since they had become so well integrated into the community, into the school, addressing the needs in the way that the mother was addressing those needs, and to have them come back to Illinois and uproot them at that point. In fact, quite frankly, Your Honor, I would submit to Your Honors that it was at least two or three years that passed by where, after the divorce, where they continued to live in Tennessee, and the father basically acquiesced in that, allowing them to stay there. The father could have forced the issue. He did not force the issue. They continued to live there. They continued to be part of that community, and that's just provided for the stability of the kids. It provides consistency for the kids, and the father didn't do anything about that. I think it's also interesting, in response to your question, that the father's not asking for a return of the bull kids or wanting the bull kids to be up here. He's asking for one. And the only reason he's asking for one is because this child's preference was, as expressed during the time of the trial, was to come. He wanted to come live with dad. When push came to shove on this case, this is what this case was all about, was about preference. The other allegations that were set out in the petition to modify, which included the elderly being concerned for the general safety and emotional well-being of the child, talking about concealment of the child, there was no evidence provided on even one of those allegations. None. There was nothing presented on that. What this court was left with, the trial court was left with, was a preference of the child. There was nothing that was presented to this court that said anything about there current situation in Tennessee. All there was was preference. And under Illinois law, substantial Illinois law, it talks about you have to have more than just preference of a child. The child's got to be in. There's got to be more than that. You can't go in there and say, let the child dictate this is where I want to live. If we allow that to happen these days, every time a child decides he doesn't like the way he's being disciplined, he's going to want to go live with the other parents. Well, that's the way it's going to be. I'm not sure who's running the asylum at that point. You can't allow a case to be dictated upon just preference of the child alone. And there is cases in the Fifth District, including the Dahl case I cited, numerous cases throughout the state that talks about preference alone. And that's what this was all left with at the end of the case. I would also point out that during cross-examination, I just asked the appellee directly, what's this case all about? Because I saw they weren't proving anything else. What's this case all about? And what the appellee responded with was, it's all about my kid wanting to come live with me. That's what the case was all about. Totally ignoring the needs of the child, totally ignoring the mother and how she is dealing with those needs, needs that the father didn't have any clue about. And I would submit to your honors that when you examine the record as outlined in the brief and as outlined just in the record itself, look at the allegations. They did not prove a substantial change of circumstances. But even arguing for a moment that they did, then we get to the second level of the analysis. And that is, when did the modification serve the best interests of this child? And here's the problem we have with this. When did the trial court make its ruling? The trial court used the wrong law. The trial court looked at the old 602 and used that law. The trial court did not look at the new 602.7 that had been in effect for about eight months. By the time we were, ten months by the time we went to trial. He looked at, the court looked at three factors under the old 602. When the new 602.7 has 17 factors the court has to consider when deciding what's in the best interest of the child. And when you look at those 17 factors that the court should have looked at at the time of the trial, there's about seven of them that don't apply. There's one that I would suggest to this court, or two of them that I would suggest to this court that are kind of a wash. One of them being that both parents want custody of the child. And another one had to do with the child having good contacts in Illinois and obviously good relationships with people in Tennessee. The only factor that they could defile under the statute that should have been examined by the court was the preference of the child. Wasn't there testimony regarding the fact that the 14-year-old's childhood friend, his best friend in Tennessee had moved away? Sure. Shortly sometime after, I'm not sure how close in proximity to the divorce. Also that an 11-year-old male at the time of the divorce may not have been needing any kind of male influence in his life when Mom was on her own. But at 14, he was expressing a desire to have more of a male influence in his life. Was there testimony with regard to that? I think it was testimony simply that he wanted to spend more time with his dad. So it didn't get into... So, you know, the analysis of the interview was the types of things that he and his dad could do together. But if they could do that together during a period of his parenting time with visitation, it wasn't going to change anything. Counsel, we'll have an opportunity for repose. Thank you. Counsel, correct me. May I please report? Your Honor, we're here today in regards to... You are Wesley Gozian? Yes, I'm Wesley Gozian. Please go ahead and stand for the record. I'm Wesley Gozian. I'm here for Donald Wilson, an athlete. He's here today. We have a case of custody here with a child named Luke. Luke is lucky in that he has two parents who love him and care for him and are arguing over what's best for his future. Luke has spent the majority of his time residing with his mother, growing up in Tennessee. We've come to the point where Mr. Wilson filed a motion to modify what's formally known as custody, now as parenting. The issue here is whether the court erred, whether they abused their discretion. We believe that Judge Brandmeier did not abuse his discretion, and we believe that his ruling was in accordance with the manifest way of the evidence. When Luke first moved to Tennessee, he moved with his mother and his brother also. Let me stop you for just a moment. I mean, the factual aspects of the case, I'm fairly familiar with, but with regard to the, you said that, you know, there was not against the manifest way of the evidence. What evidence is there to suggest that he had met the first burden of a substantial change in circumstances? And then secondly, what evidence is there that, you know, this serves his best interest? The evidence that was presented to show that there were changes in circumstances, one is that he did get older. Now, Mr. Zanton does make a valid point that every time there is a modification case, the child is older. This case is distinguishable from those in that he's gotten quite a bit older from the first time he moved down to Tennessee, and his needs have changed as he's grown older. He was just a young boy when he moved down there with his mom, and his mom provided the nurture and support that he needed at that point in time. I understand that, but what is the evidence that Judge Brandemeier heard with regard to those types of concerns? He heard evidence in what Luke's preferences are in regards to getting older. He wants to be a mechanic when he gets older, and he desires the ability to have somebody help guide him in that direction. His grandfather, Ron, helps him tinker around with things. He meets with his Uncle Lonnie and works on jet skis. He's got to work on installing a floor for his grandpa, Ron. His father is a sprinkler fitter and helps him learn about those aspects of mechanics and pipe fitting and sprinkler fitting. So there was evidence presented in that regard that being with his father here in Illinois exposes him to various aspects of life that he's not going to be exposed to in Tennessee, and going forward with his life to reach his goal of becoming a mechanic. And in the order granting the modification, did Judge Brandemeier allude to those things? There was some reference to the desire to be a mechanic and some of those aspects. There was further desire that Luke stated that he wanted to be in a smaller group environment, which the Woodlawn School would provide versus the school in Tennessee that he was attending. It was a rather large school, and his social interactions that he had in general were different. He had a friend in Tennessee named Chris who you had mentioned earlier. He moved away to West Virginia. Once his best friend was gone, Luke stated that he didn't know where any of his other friends in Tennessee were. While he was talking to Judge Brandemeier in Chambers, he did make reference to the fact that he referred to being at his father's house as home. He referred to his father's neighbors as his neighbors. He had more of a home feeling there. He knew people's names. He knew where they lived. He had a lot of interactions with his neighbors and family here at his father's house versus in Tennessee. While Chris was still in Tennessee, he did have a good pally hung out with them. He referenced that while he's in Tennessee, he mainly plays Xbox One at home. He doesn't interact much. Judge Brandemeier also made reference to the fact that Ms. White's description of Luke as being very social in Tennessee contrasted quite a bit from Luke's version of what he does in Tennessee and that he wasn't very socially active. There was reference that Ms. White made that Luke was wanting to be in ROTC with his brother Austin. There wasn't a single reference made by Luke that he was in ROTC or looking forward to going into ROTC. A lot of what he talked about was being in a small environment where he had the opportunity to be outside, likes playing with the dog at his grandpa's house. Those are all changes in Luke's life, changes in his desires. Having a smaller school environment is something that he would like. The school in Tennessee was pretty large. He wasn't able to tell the judge how big the school was, but it was a school situation where the grade school and the high school were all within the same block, so it was a large campus environment for him. Luke does in fact have IEP issues. When we discussed the IEP earlier in here, at trial I did ask Ms. White if she had told Mr. Wilson about the IEP and she said she had not. I didn't inquire as to whether she was concealing that from him. I just simply asked if she had told him and she informed us that she had not. Mr. Wilson, being in Illinois versus Tennessee, did not have the ability to micromanage day-to-day school operations. Luke was able to have good guidance from his mother at school in Tennessee. We're not arguing that he didn't have good guidance. The simple fact is that as he's grown older, those needs have changed. It's clear that, in my opinion, the ability for him to learn from his grandpa, learn from his uncle, learn from his father on these things, his path to become a mechanic or explore becoming a mechanic, are things that are certainly in Luke's best interest. Not to mention being in a smaller environment where he has better opportunity to thrive. When he's in a better environment, that would give him better opportunity to work on his schooling issues. With regard to learning from his father and grandfather and uncle, wasn't there testimony about Dad transporting Luke with open alcohol in the car and that part of the thing that Luke likes to do with Grandpa is to hang out at the tavern and that there's some maybe more nefarious things that Luke is learning from? There was some testimony to that. I believe the testimony from Mr. Wilson is that the beer in the vehicle with him was from his house to his father's house, which is just down the road. He's not proud of that fact, but it is a fact here. In regards to Luke going to the bar with his grandpa, this Walnut Hill bar that's referenced is not just a bar. It's a bar and restaurant, and they have pool tables, and it's the nearest place that... Is that in Clinton County? It's in Jefferson County, I believe. It's near the Jefferson and Marion County border. But it is the nearest place that they can go play pool to where they're located. Ron Wilson likes to play pool with his grandson, and Luke likes playing pool as well. The fact that they serve alcohol there is a minor issue here because it's hard to find a place to play pool that doesn't serve alcohol, especially in this area. As far as the ability for Mr. Wilson to be available for Luke, he gets home... He gets off of work at 3.30 each day. Luke made reference that he likes to cook with his father. They grill together. He also grills with his father's neighbor, who we refer to as his mother. That's something that his mom did admit that he wanted more home cooking, and she thought maybe she could provide more of that if she didn't change her job from nursing manager to just a regular floor nurse. We believe that our verdict was met at the trial court, and Judge Brandmeier's ruling should be affirmed. The parties did express the ability to be able to co-parent, no matter which way the court's ruling was. They worked out a co-parenting plan in mediation, and at trial they agreed that they were going to work with that, and Luke and Cameron believed that his parents would make efforts so he would be able to see them both. The distance that was currently in effect while Luke was in Tennessee and his father was in Illinois didn't provide a barrier to just the regular father-son relationship that Mr. Wilson might have been able to provide had they lived in a close environment. It may not have been necessary to file a motion to modify the parenting time and parental responsibility, but due to the distance, Mr. Wilson was only getting to see Luke one weekend a month, and that doesn't provide a lot of time to do father-son bonding and parenting. The court's decision here, we believe, is correct for the reasons stated. We believe that it is in Luke's best interest that he will have a more active lifestyle, he will be able to hone his mechanic skills as he goes forward, he'll have smaller groups to develop and flourish. We believe that furthermore, he's going to have better access to family members. All that's in Tennessee is his mom and his brother Austin. His brother Austin is 17, so he'll soon be emancipated. That's one of the reasons why he was not brought up in this condition. So, I don't know what Austin's plans are for the future, but if he moves from Tennessee, all that's there is Miss White. Miss White's relatives are in this area, Mr. Wilson's relatives are in this area, and Luke has friendships with Mr. Wilson's neighbors, which are Luke's neighbors. The parents are in agreement on taking care of Luke. As far as visitation and those sorts of things are concerned, we believe the trial court should be affirmed here. Otherwise, I stand on my brief and am willing to entertain any further questions. Thank you, counsel. Thank you. You're welcome. Counsel mentioned that the father wouldn't have the ability to monitor education, but they have this thing called an internet now, and I think they can do all sorts of stuff with, first, the websites and finding out how kids are doing in school and how to contact the school to find out information. So, to say that he didn't have any ability to monitor that would be incorrect. I think it's more of a he wasn't interested enough to do it. The argument that the child can learn from the father and the grandfather about certain things, Luke can do that when he visits. Reference is made to the school that he would be attending here in Illinois being smaller. I think that was a given. But interestingly enough, at the time of the trial when he was interviewed by – when the child was interviewed by the court, he had not even seen the school. He did not know anybody that attended the school. He had no friends. Listening to argument today, the only thing outside of grandpa and dad is he happens to know some neighbors. So he doesn't really – he didn't really have the connections to this area other than grandpa and dad. The court also, in its ruling, referenced the case of Anderson and used that as the basis for basically relying upon preference of the child alone. That Anderson case is the only case that I can find where the court did that. But that case, when you read it, you will learn that the parents lived very close to one another. They got along. The child was over and was basically going back and forth between the parents. It really ended up not being that big a deal. So when one child said, well, I'd like to spend more time with the other parent, quite frankly, it ended up not being that big a deal because they were going to see both parents a lot. That's not the case we have here. We have a distance issue, which is one of the factors under 602.7 that the court should have taken into consideration but didn't. Anderson is just a – is just, to me, is a really odd case. And that was the only one that I could find that talked about allowing a child to go where he preferred to go, and that was the only factor. I think what this comes down to is this. You have a parent, the mother, who the child says treats him well. This same parent deals with the needs of the child on a daily basis. An important need is academic, something the father had no clue to. Is it in the best interest of the child to take the child away from that situation, from a parent who treats him well, does right by the child, addresses the child's needs, even the important needs, and deploys him with a father who didn't have a clue about what his needs were, something where the parent or the child and the parent could still spend time together and do the things like tinkering around with mechanic-type stuff? That's fine. But your – the trial court removed this child from a situation that he was doing okay in, that he was thriving in. And I think that was highly inappropriate. It was inconsistent with the case law. As I mentioned, the court had misapplied the law in its analysis, used the wrong analysis, and I would ask the court to reverse the trial court's ruling. All right, thank you. Thank you, counsel. The court will take the matter under advisement and issue a decision in due course.